## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**FRANK M. BAFFORD,**

                    **Plaintiff,**

**vs.**                                                    **Case No. 8:06-CV-657-T-27TGW**

**TOWNSHIP APARTMENTS**
**ASSOCIATES, et al.,**

                    **Defendants.**
_____/

## ORDER

**BEFORE THE COURT** is Plaintiff's *pro se* Amended Motion for Final Summary Judgment

(Dkts. 200, 201)[1], Township Apartments Associates, Ltd.'s Memorandum of Law in Opposition

(Dkt. 250), Township Apartments Associates, Ltd.'s Motion for Summary Judgment (Dkts. 246,

299), and Plaintiff's Response/Answer to Township's Summary Judgment, Part 1 of 2. (Dkt. 293).[2]

Upon consideration, Township Apartments Associates, Ltd.'s Motion for Summary Judgment (Dkt.

246) is **GRANTED**.  Plaintiff's Motion for Final Summary Judgment (Dkt. 200), to the extent it

seeks summary judgment against Township, is **DENIED**.  There are no material facts in dispute and

Township is entitled to judgment as a matter of law.

_____

[1] The Court will not consider Plaintiff's Notice of Second Additional Information for Final Summary Judgment, Perjury/and Motion for Partial Summary Judgment against Marcus & Millichap and Darron Kattan (Dkt. 236), as this document has been stricken because it includes baseless accusations of perjury against a party, in contravention of admonishments to Plaintiff to refrain from doing so.  Moreover, the Notice was untimely pursuant to the Court's Case Management and Scheduling Order.  (See Dkt. 36).

[2] The Court notified *pro se* Plaintiff of the provisions of Rule 56 in accordance with *Johnson v. Pullman, Inc.*, 845 F.2d 911 (11th Cir. 1988) prior to Plaintiff's response. (Dkt. 278).  The Court granted Plaintiff three extensions of time to respond to Township's Motion for Summary Judgment. (*See* Dkts. 298, 314).  Nevertheless, Plaintiff never filed "part 2" of his response to Township's Motion for Summary Judgment.

**Background**

Plaintiff, an African American, brought this action pursuant to 42 U.S.C. §§1981 and 1982, alleging that he was discriminated against based on his race when Township Apartments Associates, Ltd., the owner of 348 apartments located in 13 separate apartment complexes, refused to sell the properties to him.[3]  (Dkt. 1).  Gary Hediger ("Hediger") is the president of Hediger Enterprises, Inc., Township's property manager for the subject properties.[4]  (Dkt. 246 at Ex. "F," Hediger Aff. at ¶¶ 2, 3).  Marcus & Millichap ("M&M") was Township's listing real estate broker.  (Dkt. 1 at ¶ 4, Dkt. 18 at ¶ 4).  Darron Kattan is a real estate broker with M&M.  (Dkt. 1 at ¶ 5, Dkt. 18 at ¶ 5, Dkt. 90 at Kattan Aff., ¶ 2).

**Record Evidence**

In early 2004, Hediger discussed with Plaintiff his interest in purchasing the Omni Apartments, one of the 13 properties owned by Township.  (Dkt. 246 at Ex. "F," Hediger Aff. at ¶ 4, Dkt. 200 at p. 2).  As a result, through Hediger, Plaintiff submitted an offer to purchase the Omni Apartments.  *Id.*  Having been contacted by numerous individuals regarding the subject properties On March 15, 2004, Hediger sent Township a list of individuals interested in purchasing the apartments, which included Plaintiff. (Id. at ¶ 5).  By early April 2004, Hediger learned that Township would be selling the Omni Apartments as part of a package consisting of the 13 apartment complexes, at "around" $21,000 per unit, or a total of $7,308,000.  (Id. at ¶ 6).

Unbeknownst to Hediger, on April 12, 2004, M&M obtained an exclusive listing on the subject properties.  (Dkt. 90 at Kattan Aff., Ex. A).  The next day, on behalf of Plaintiff, Hediger

---

[3] Plaintiff's specific performance count was dismissed with prejudice.  (Dkt. 107).

[4] The "Hediger" defendants were dismissed from the case as a result of Plaintiff's non-compliance with an order directing him to pay costs taxed against him pursuant to Federal Rule of Civil Procedure 41(d).  (Dkt. 198).

faxed a $7.3 million offer to Township. (Dkt. 246, Hediger Aff. at ¶ 10).  On April 19, 2004, having

learning that M&M had an exclusive listing on the properties, and that the listing price was $8

million, Hediger spoke with Plaintiff, and as result, faxed a letter to M&M, stating: "One client,

Frank Bafford, is ready to submit an $8,000,000.00 offer with a $25,000 non refundable deposit."

(Dkt. 247, Ex. 2).[5]  That same day, Steve Brown sent an e-mail on behalf of Township to M&M

stating, "I think we are about ready to move forward with the Fernandez/Allied offer." (Dkt. 247,

Roark Depo. at p. 88 and Ex. 13).  Ultimately, Township accepted Allied's offer.  According to

Ronald Roark, Township's Rule 30(b)(6) witness, Township was not aware of the Hediger fax when

it decided to accept Allied's $8 million offer.  (Roark Depo. at pp. 20, 29).

This record contains an admission by Plaintiff that his last written offer to purchase the

subject properties was for  $7,308,000.[6]  (Dkt. 246 at Ex.B, ¶ 4).  Aside from this admission, there

is a factual dispute, not material to the issues, as to whether Plaintiff's intent to offer $8 million was

ever communicated to M&M.  Plaintiff avers that "Hediger faxed my $8,000,000.00 contract to the

owner to have it signed." (Dkt. 200, Bafford Aff. at ¶ 2).  Plaintiff contends that he faxed Kattan "a

copy of the contract that Hediger faxed over to the owner to have it signed."  (Id. at ¶ 3).  Hediger

had been in contact with Kattan's colleague, Steven Sussman.  (Dkt. 90 at Kattan Aff., ¶ 3). "During

---

[5] Plaintiff mistakenly believes that Hediger, as he requested, crossed out his $7.3 million offer and inserted an $8 million offer and faxed that to Township. (Bafford Depo. at p. 145).  Plaintiff has never seen such a document but believes it to exist.  (Id. at p. 149).  Hediger explains that he told Plaintiff he could not do that and that the new offer would have to be in writing. (Dkt. 246 at Ex. F ¶ 12).  Although Hediger maintains that he never communicated Plaintiff's intention to make an offer above $7.3 million to Township, it is undisputed that he authored the fax to M&M referencing the potential $8 million offer from Plaintiff.

[6] Plaintiff's record admission is by virtue of his failure to respond to Township's Request for Admissions.  *See* Fed. R. Civ. P. 36(a).  Plaintiff also effectively admitted that his last written offer to purchase the subject properties from Township was for approximately $7.3 million. (Dkt. 246 at Ex. B, ¶5).  Subsequent to submission of his affidavit, Plaintiff was deposed and testified that he "came across new information since the filing of that affidavit and the new information informs me that Hediger submitted an offer to more than $8,000,000.00," specifically $8,050,000.00.  (*See* Dkt. 247 at Ex. E1, p.12).

the conversation, [Plaintiff] mentioned that he had previously entered into an agreement with Hediger to purchase the property. I had no knowledge of those negotiations or purported agreement, but [] knew and conveyed to Bafford that [M&M] had an exclusive listing." (Id.)  Kattan told Bafford to forward any offer he wished to make to him.  (Id. at ¶ 4).

Township received seven or eight offers to purchase the subject properties, including three $8 million offers.  (Roark Depo., Dkt. 247, Ex. A, p. 25).  Township ultimately accepted Allied's $8 million offer.  Allied had a proven track record and its offer was the only offer not subject to a financing contingency. (Id. at p. 87-88).[7]  As will be more fully discussed, Allied's offer was more favorable to Township than any of the other offers, including Plaintiff's.  For example, Allied's offer was for $8 million whereas the only written offer from Plaintiff was for $7.3 million.  Allied's offer was an all cash offer, whereas Plaintiff's offer included a 100% financing contingency.  (Id. at p. 21).  Allied's offer included a non-refundable $150,000.00 deposit. (Id. at p. 24).  Plaintiff's offer provided for a $25,000.00 refundable deposit. (Id. at p. 81, Ex. 8).  Allied's offer provided for closing within 60 days, whereas Plaintiff's offer provided for closing within 120 days.  (Id. at pp. 90, 91, Ex. 11).  Allied's offer provided that it would obtain a bond in conjunction with the applicable land use (LURA) restrictions. (Id. at pp. 86, 91).  Plaintiff's offer did not address the LURA restrictions.  (Id. at p. 82).

The Listing Agreement sought potential purchasers who would require not more than 80% financing, would close within 90 days of the contract, would put a 5% deposit down and provided that the buyer must obtain a bond to insure compliance with Section 42 requirements on each property.  (Roark Depo., Dkt. 247, Ex. A, at p. 22, Ex. 2).  According to Roark, people trying to

---

[7] Although Allied ended up financing a portion of the transaction, Township first learned that Allied would be obtaining financing at the closing.  (Id. at p. 27).

finance more than 80% of the purchase price are oftentimes more apt not to be able to close.  (Id. at p. 77).  Roark testified that even if he knew Plaintiff was willing to offer $8 million for the subject properties, he still would have accepted Allied's offer, considering the other contingencies.  (Roark Depo., Dkt. 247, Ex. A,  at p. 90).

### Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (internal citations omitted).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 323-24.  Plaintiff's evidence must be significantly probative to support the

claims. *Anderson,* 477 U.S. at 249.  The evidence favoring the non moving party must be sufficient

for a jury to return a verdict for that party. *Id.*; *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir.

1990).

The Court will not weigh the evidence or make findings of fact.  *Anderson*, 477 U.S. at 249-

50; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).  Rather, the Court's role is

limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for

the non-moving party.  *Id.*  If reasonable minds could differ as to whether the plaintiff has established

a *prima facie* case, then a question of fact remains, which the trier of fact will be called upon to

answer.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-10 (1993); *see also Anderson*, 477 U.S.

at 250-51 (summary judgment is not appropriate "[i]f reasonable minds could differ as to the import

of the evidence"); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)("[i]f reasonable

minds could differ on the inferences arising from undisputed facts, then a court should deny

summary judgment").

## Discussion

*Township's Knowledge of Plaintiff's Race*

Section 1981 "protects an individual's right to be free from racial discrimination in the

'making, performance, modification, enforcement, and termination' of contracts."[8]  *Perdue v.

Pilgrim Pride*, 237 F. App'x 432, 433 (11th Cir. 2007).  "The aim of the statute is to remove the

impediment of discrimination from a minority citizen's ability to participate fully and equally in the

marketplace."  *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991)

(citation omitted).  Section 1982 provides that "[a]ll citizens of the United States shall have the same

---

[8] "Section 1981(a) provides, in pertinent part: 'All persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws ... as is enjoyed by white citizens....'" *Njie v. Regions Bank*, 198 F. App'x 878, 882 (11th Cir. 2006) (citing 42 U.S.C. § 1981(a)).

right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

To succeed on a cause of action under § 1981, a plaintiff must establish: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Jackson v. BellSouth Telecomms.,* 372 F.3d 1250, 1270 (11th Cir. 2004) (citing *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1235 (11th Cir. 2000)). To survive summary judgment, Plaintiff must identify a genuine issue of material fact as to each element. *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007). "Section 1981 requires proof of *intentional* discrimination." *Brown*, 939 F.2d at 949 (citations omitted). Similarly, for a § 1982 claim, Plaintiff must demonstrate that he was deprived of a property interest because of an intentional act based on racial animus. *Humphrey v. United Parcel Service*, 200 F. App'x 950, 952 (11th Cir. 2006).

The analysis for determining whether intentional discrimination in violation of § 1981 and § 1982 has occurred is the same as that used in Title VII discriminatory treatment causes, the *McDonnell Douglas/Burdine* framework.[9] *Brown,* 939 F.2d at 949; *LeFlore v. Sea Breeze Nursing Home and Rehab. Ctr., Inc.*, 2000 WL 726215, at *3 (S.D. Ala. May 8, 2000) (citations omitted).

In that analysis, a three part test is utilized to determine the motivation of a defendant in taking the challenged action. *Brown*, 939 F.2d at 949 (citations omitted). "The initial burden rests with the plaintiff to demonstrate by a preponderance of the evidence a prima facie case of discrimination." *Id.* This burden is not onerous and can be met by demonstrating that "the plaintiff

---

[9] Here, Plaintiff presents no direct evidence of race discrimination. *See Chambers v. Walt Disney World Co.,* 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001) ("[t]o amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus."); *Cooper v. Southern Co.,* 390 F.3d 695, 702, 723 n. 15 (11th Cir. 2004) ("[d]irect evidence is evidence which itself proves the existence of discrimination and does not require inference or interpretation....").

is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual who is not a member of a protected class." *Id.*

The defendant must then come forward with evidence demonstrating legitimate, nondiscriminatory reasons for its conduct. *Id.* (citation omitted). This burden on the defendant is one of production, not persuasion. *Id.* (citations omitted). Finally, once the defendant satisfies this obligation, the plaintiff must produce evidence suggesting that those proffered reasons are merely a pretext, "the real reason for the action having been based on race." *Id.* (citations omitted).

Township argues that it is entitled to summary judgment because Plaintiff has no evidence that Township knew of Plaintiff's race when it accepted Allied's offer, which relates directly to whether Township acted with the intent to discriminate on the basis of race, the second factor enumerated in *Jackson v. BellSouth Telecomms.,* 372 F.3d 1250, 1270 (11th Cir. 2004). In support of its contention that Plaintiff cannot establish that Township knew Plaintiff's race prior to its acceptance of Allied's offer, Township relies in part on Plaintiff's admission that "[n]o one from Township Apartments Associates, Ltd. was ever aware of [his] race before [he] filed the state court lawsuit against Township [] in 2004." (Dkt. 246 at Ex. B, ¶ 16). Township also cites to Roark's deposition testimony as well as Hediger and Kattan's affidavits.[10]

Simply put, if Township did not know of Plaintiff's race, it could not have intended to discriminate against Plaintiff on the basis of race when it accepted Allied's offer over Plaintiff's.

---

[10] Roark testified that Township never had any direct dealings with Plaintiff, that no one ever communicated Plaintiff's race to Township and that Township was unaware of Plaintiff's race before litigation began. (Dkt. 246, Ex. A, p. 95). Plaintiff's contact was Hediger, whose company served as Township's property manager. Roark never had any conversations with Hediger about Plaintiff's race. Id. Plaintiff does not contend that he ever communicated directly with anyone from Township. He relies on his speculation that either Hediger or Kattan knew of his race because he contends that he sounds like an African American on the telephone. (Dkt. 246, Ex. E, pp. 176-178). Both Hediger and Kattan have averred, however, that they were unaware of Plaintiff's race prior to the sale of Township's properties to Allied. (Dkt. 246, Ex. F, ¶ 15; Dkt. 90, ¶ 3).

*Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987); *see Cooper*, 260 F. Supp. 2d at 1363; *accord Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003)("...an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion").

In response to Township's motion for summary judgment, Plaintiff presents no evidence that Township actually knew of his race prior to its acceptance of Allied's offer. Rather, Plaintiff contends that he mentioned his race to Hediger and that Kattan would have known his race because they spoke on the telephone. Even drawing all favorable inferences in Plaintiff's favor from these contentions, for purposes of summary judgment, any knowledge of Plaintiff's race on the part of Hediger or Kattan cannot be imputed on the record evidence to Township.

Plaintiff testified in his deposition that he mentioned his race to Hediger and employees in the HEI property management office. This is disputed, however, because according to Hediger, he never knew that Plaintiff was an African American until Plaintiff sued Township and had only telephonic contact with Plaintiff, never recognizing any indication of Plaintiff's race from those conversations. (Hediger Aff. at ¶ 15). While Plaintiff's testimony that he mentioned his race to Hediger creates a factual issue as to whether Hediger knew Plaintiff's race, that factual issue is not material to Plaintiff's claim against Township because Plaintiff has no evidence that Township knew of Plaintiff's race. There is no record evidence that Hediger ever told anyone at Township of Plaintiff's race. According to Roark, he never had any conversations with Hediger about Plaintiff's race and had no real knowledge of Plaintiff's race until he met Plaintiff at the courthouse. (Roark Depo. at p. 96).

Plaintiff speculates in his deposition that Kattan may have known of his race based on their telephone conversations. However, Plaintiff's speculation is not sufficient to impute knowledge of

his race to Kattan, let alone Township.  Kattan avers that he  never met Bafford and was unaware of his race until legal proceedings began.  (Dkt. 90, Kattan Aff. at ¶ 3).  This is supported by Roark's testimony that he never had any communication with the broker about Plaintiff's race before Plaintiff filed suit.  (Roark Depo. at p. 96).  Moreover, Plaintiff confirms that he never met Kattan in person.  (Dkt. 247, Ex. D Bafford Depo. at p.177).  When asked how Kattan would know Plaintiff's race, Plaintiff testified, "Like I said, I mean, it doesn't really matter to me how he would know my race.  The only thing I have to do, based upon law, is present alleged – present a prima facie case of alleging racial discrimination, you know.  It's for the – the respondent or the defendant to determine or argue how they didn't know my race, or whatever, you know."  (Id.)  When asked if he had any facts that would lead him to believe that Kattan knew his race, Plaintiff replied, "[w]ell, you know – you know, I mean, it's not accepted as a legitimate thing.  But, you know, 90 something percent of the time, you can tell someone's race by their voice."  (Id. at p. 178).  "[M]y phone voice does not sound like a white male or Hispanic or some person from some island or country.  I sound like a black, African American male, and so that's what people deal with me as when I talk to them on the phone, is a black, African American male."  (Id.)

Even if Plaintiff's testimony could give rise to an inference that Kattan may have surmised Plaintiff's race, there is nothing in this record to impute any such surmise to Township.  Accordingly, the Court finds that no reasonable trier of fact could conclude that Township knew of Plaintiff's race when Township accepted Allied's offer.  *See Cooper v. Southern Co.*, 260 F. Supp. 2d 1352, 1364 (N.D. Ga. 2003) (plaintiff could not establish discriminatory intent where the sum of the plaintiff's evidence only supported a finding that the decisionmakers could have discovered the plaintiff's race but did not contradict evidence that neither decisionmaker actually knew the plaintiff's race when deciding who to interview for the relevant positions).

In sum, Plaintiff has presented  no evidence establishing or inferring that either Hediger or Kattan, even if they knew Plaintiff's race, ever shared that knowledge with anyone at Township. "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001).  Even if Hediger and Kattan knew of Plaintiff's race, that knowledge cannot be imputed to Township. Plaintiff's failure to present any evidence that Township knew that Plaintiff was an African American is fatal to Plaintiff's § 1981 claim against Township.  *See Mitchell v. Shane*, 350 F.3d 39, 49 (2nd Cir. 2003).[11]

## Legitimate Non-Discriminatory Business Reasons

Even if knowledge of Plaintiff's race could be imputed to Township, this record demonstrates unequivocally that Township had legitimate, non-discriminatory business reasons for its decision to accept Allied's offer rather than Plaintiff's.  The most prominent reason is that Plaintiff's written offer was several hundred thousand dollars less than Allied's.  In addition to the price difference, Plaintiff's offer was less favorable than Allied's in several material respects.  Allied's offer was an all cash offer without any financing contingencies, whereas Plaintiff's offer contained a 100% financing contingency.[12]  Allied was a buyer with a track record, whereas Roark's impression of Plaintiff's offer was that Plaintiff was a less experienced, prospective purchaser and accordingly less likely to be able to close.  Indeed, Plaintiff has admitted that he has no experience with tax credit multi-family housing.  (Dkt. 246 at Ex. B, ¶ 2).

---

[11] Plaintiff's inability to present a prima facie case is further demonstrated by his admissions that he never had any face to face contact with anyone from Township and no one from Township was aware of Bafford's race before he filed suit in state court against Township in 2004. (Dkt. 246, Ex. B, Township's First Request for Admissions to Plaintiff).

[12] Although Allied ended up financing a portion of the purchase, Township first learned of that at the closing. This does not negate the more favorable terms of Allied's offer, since Allied's offer was not subject to a financing contingency, as noted.

Additionally, Plaintiff's offer did not meet the requirements of the Listing Agreement. The Listing Agreement called for potential purchasers who would not require more than 80% financing, would close within 90 days of the contract, would include a 5% deposit and would obtain a bond to insure compliance with Section 42 requirements on each property. Allied's offer provided for closing within 60 days, whereas Plaintiff's offer provided for closing within 120 days. Allied's offer included a $150,000.00 non-refundable deposit. Plaintiff's offer, on the other hand, provided for a refundable $25,000.00 deposit. Allied's offer provided that it would obtain a bond for land use restrictions under the Land Use Restriction Agreement with the Florida Housing Finance Corporation, whereas Plaintiff's offer did not address those restrictions.

Plaintiff contends that he offered $8 million for the subject properties. Plaintiff does not contend that he actually submitted an $8 million offer to Township or M&M, however, and Plaintiff has produced no such offer.[13]  Rather, he contends that on April 16, 2004, he told Hediger that he would pay $8 million, and believes that Hediger crossed out his $7.3 million offer and submitted an $8 million offer to Township on Plaintiff's behalf, because Hediger told him he had done so. Accordingly, Plaintiff asserts in his affidavit that "Hediger faxed my $8,000,000.00 contract to the owner to have it signed. The only thing different about this contract versus the one we agreed to at $7,308,000.00 was the sales price. All the terms remained identical." (Dkt. 129 at Bafford Aff., ¶2).

---

[13] The documents and information Plaintiff relies on to support his motion, in addition to his affidavit, largely do not constitute admissible evidence. Moreover, many of the averments in his affidavit include inadmissible hearsay and are not based on personal knowledge, as required by Rule 56. The Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). "[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." *Id.* (quoting *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978)). Accordingly, to the extent Plaintiff contends that an $8 million written offer from him exists, it is not sufficient for Plaintiff to merely allege that in his affidavit. The only evidence Plaintiff has demonstrating that Township was ever aware of his intention to submit an $8 million offer is Hediger's April 19, 2004 letter to Sussman, indicating that Plaintiff was "ready" to make one. Despite this letter, the only written offer made by Plaintiff was his $7.3 million offer faxed to Kattan the next day. As noted, Township accepted Allied's offer of $8 million that same day.

According to Hediger, however, he told Plaintiff that he could not mark through the $7.3 million offer and that Plaintiff would have to send a new offer in writing.[14]

Whether Plaintiff made an $8 million offer through Hediger is not material, however, to whether Township had legitimate, nondiscriminatory reasons for accepting Allied's offer. Even accepting as true that Hediger faxed an $8,000,000 offer, that offer, according to Plaintiff, contained the "identical" terms of his original offer. Those terms, as discussed, were less favorable than Allied's offer, as they included a 100% financing contingency, provided for a longer closing period, a smaller deposit and did not meet the requirements of Township's Listing Agreement.[15]  Indeed, Roark testified that even if he knew Plaintiff was willing to offer $8 million, he would have accepted Allied's offer, considering the other contingencies. (Dkt. 247 at Ex. C, Roark Depo. at p. 19).

In any event, it is not this Court's responsibility to second guess Township's reasons for accepting Allied's offer. The only issue is whether the reasons given are merely pretext for discriminatory intent. *Brown v. American Honda Motor Co.*, 939 F.2d at 951. Township's decision to accept Allied's offer could have been for a good reason, bad reason or no reason at all, so long as it was not for a discriminatory reason. *Id.* In this regard, Township's proffered reasons for accepting Allied's offer are unquestionably legitimate and nondiscriminatory. In a transaction as complex as this one, Township's preference to accept an all cash offer from a buyer with a track record such as Allied's is a legitimate, nondiscriminatory reason, in and of itself.

In sum, Allied's offer was at a price greater than Plaintiff's, contained more favorable terms,

---

[14] Hediger's April 19, 2004 letter to Sussman, an M&M employee, supports Hediger's version of what occurred and dispels Plaintiff's belief that Hediger faxed a new offer to Township: "One client, Frank Bafford, is ready to submit an $8,000,000.00 offer with a $25,000 non refundable deposit." Moreover, Plaintiff's testimony that he believes Hediger crossed out his $7.3 million offer and wrote in an $8 million offer because Hediger told him that he did constitutes inadmissible hearsay, as it relates to Township. *See* Fed. R. Civ. P. 801(c). "Inadmissible hearsay generally cannot be considered on a motion for summary judgment." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004).

[15] On April 19, 2004, Plaintiff communicated to Hediger that he would "allow" his deposit to be non-refundable. (Dkt. 201, Ex. H).

met the requirements of Township's Listing Agreement and was submitted without a financing contingency.  There was a greater likelihood of closing with the terms offered by Allied as opposed to those offered by Plaintiff.  Indeed, of the seven or eight offers received by Township, only Allied's was an all cash offer, and given Allied's proven track record, its offer was the most attractive one, according to Roark. (Dkt. 246, Ex. A. pp. 22, 25, 26, 47, 49, 52).  Based on this record, Township has met its burden of establishing that its acceptance of Allied's $8 million offer was based on legitimate nondiscriminatory business reasons and had nothing to do with Plaintiff's race. "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." *Brown*, 939 F.2d at 950.

In this regard, Plaintiff has presented no evidence of pretext.  Rather, Plaintiff argues that he has no burden to produce evidence because Defendants have failed to meet their burden. Plaintiff is mistaken. Since Township has proffered legitimate, nondiscriminatory reasons for accepting Allied's offer,  the burden shifted to Plaintiff to meet those reasons "head on and rebut" them and he cannot succeed by simply quarreling with the wisdom of those reasons. *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000).  In the face of Township's legitimate, nondiscriminatory reasons, Plaintiff could survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the legitimate, nondiscriminatory reasons. *Mora v. Univ. of Miami,* 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998).  "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted).  A reason is not pretext for discrimination, however, "unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v.*

14

*County Comm'n of Jefferson County, Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006)(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 515).

Plaintiff has not come forward and rebutted Township's legitimate, nondiscriminatory reasons for accepting Allied's offer over Plaintiff's.  It is not sufficient to establish pretext for Plaintiff to merely take issue with the wisdom of Township's decision or even by showing that his offer was financially more favorable.[16]  He must show that Township's decision was in fact motivated by race and that its legitimate, nondiscriminatory reasons are merely pretextual. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000)(internal quotations omitted)(plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer.).  In another context, it has been observed that a plaintiff "must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *See Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005).

On this record, Plaintiff cannot meet his burden under a *Cooper* analysis to show that the disparities between his offer and Allied's were so severe that no reasonable person could have chosen Allied's offer over his.  Plaintiff must produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the

---

[16] For example, Plaintiff argues that Township would have made more money selling the properties to Plaintiff. (Dkt. 293 at p. 6).  (Dkt. 1 at ¶ 54).  However, Plaintiff has presented no evidence to support this contention. In contrast, Exhibit C to Kattan's affidavit demonstrates that the commission on the $8 million sale was $320,000, leaving a net profit in excess of Bafford's $7.3 million offer.  Accordingly, any such argument by Plaintiff is unconvincing.  Further, Plaintiff has not presented any evidence to call into doubt the assessment that Allied was a more experienced purchaser more likely than Plaintiff to close the deal.

adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). It is the court's responsibility "for drawing the lines on what evidence is sufficient to create an issue on pretext." *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002).

The only evidence offered by Plaintiff which could arguably be material to pretext is his contention that Kattan told him after Allied's offer had been accepted that Township did not want to sell to "someone like me." (Dkt. 246, Ex. E, p. 176).[17] Considering this statement, in a light most favorable to Plaintiff, as circumstantial evidence of pretext, summary judgment in favor of Township is nonetheless warranted under *McDonnell Douglas*. Considering Township's legitimate, nondiscriminatory reasons for accepting Allied's offer, and considering the inferior terms of Plaintiff's offer when compared to Allied's, no rational fact finder could find, based on such weak evidence, that Township's reasons for accepting Allied's offer were pretext for intentional discrimination against Plaintiff because of his race. As this Circuit has observed, "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was

---

[17] Kattan denies having made this statement. (Dkt. 90, ¶ 5). Notwithstanding, for purposes of summary judgment, assuming it was made, this statement is race neutral and ambiguous, as it could very well have referred to the unfavorable terms of Plaintiff's offer and his lack of experience in managing low income housing. Accordingly, this statement, subject to more than one possible meaning, is properly evaluated as circumstantial evidence. *See Mora v. Univ. of Miami*, 15 F. Supp. 2d at 1333-34.

untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. *Chapman v. AI Transport,* 229 F.3d at 1025.

Here, Plaintiff's evidence is weak at best. As discussed, this record conclusively reveals legitimate, nondiscriminatory reasons why Township accepted Allied's offer over Plaintiff's. Considering the record as a whole, there is abundant and uncontroverted, independent evidence that Township did not discriminate against Plaintiff. The Court's responsibility is not to second guess the wisdom of Township's business judgment but rather to determine if the reasons given for that decision are merely a cover for discrimination. *See Brown*, 939 F.2d at 951. Here, a rational fact finder could not conclude that Township's reasons for accepting Allied's offer were a cover for discrimination. Township is entitled to judgment on Plaintiff's § 1981 and § 1982 claims.

*Agency*

In his affidavit, Plaintiff avers that he negotiated "with HEDIGER the agent of Township Apartments." (Dkt. 200, Ex. A, ¶¶ 2, 6). Plaintiff relies on this unsupportable assertion that Hediger was acting as Township's agent with authority to bind Township. However, a conclusory statement such as this will not provide an evidentiary basis for purposes of summary judgment. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Plaintiff has not established that Township ever acknowledged Hediger as its agent, that Hediger accepted that role or that Township exercised any control over Hediger. Plaintiff has not met his burden of establishing those essential components of an agency relationship. *See Eberhardy v. General Motors Corp.*, 404 F.Supp. 826, 831 (M.D. Fla. 1975); *Ilgen v. Hnderson Properties, Inc.*, 683 So. 2d 513, 515 (Fla. 2d DCA 1996). Plaintiff's subjective belief is insufficient. Moreover, Plaintiff acknowledged in his deposition that Hediger never claimed to have authority to make decisions on offers to purchase Township's property. (Dkt. 246, Ex. E, p. 85). At most, the evidence establishes that Hediger was Township's property manager

17

for the subject property but was never Township's agent with regard to the sale. (Dkt. 246, Ex. A, pp. 13, 16; Ex. F, ¶¶ 3, 11).[18]  In sum, Plaintiff has presented no evidence that Hediger was the actual or apparent agent of Township with authority to bind Township with respect to the sale of the subject property.

Plaintiff asserts that Exhibit B-1 to his Motion establishes that Township's owner was "aware and in agreement with Hediger acting as their agent."  (Dkt. 200 at p. 2).  Exhibit B-1 is a fax transmittal with a note from "Misty" to "Becky" providing the yearly water, sewer and trash bills for the year 2003 for "Omni."  Although Plaintiff argues that he received the document from the local management office, he does not attest to such.  Further, he states that the fax came from "Crown Northcrop, another company owned and controlled by the owner of Township," but does not explain how this establishes Township's consent to Hediger acting as its agent.  Plaintiff testified in his deposition that the March 15, 2007, letter from Hediger to Ronald Roark listing 10 individuals interested in purchasing the Omni apartments establishes that Township knew that Hediger was negotiating on its behalf.  (Dkt. 247 at Ex. E, p. 29).

*Collateral Estoppel/Res Judicata*

Plaintiff contends that collateral estoppel bars Township from defending this action, based on certain administrative proceedings arising from a complaint he filed with the Florida Commission of Human Rights, which was referred to the Florida Division of Administrative Hearings

---

[18] Likewise, Plaintiff cannot establish apparent agency because he has presented no evidence that Township represented that Hediger was its agent or otherwise created the appearance of an agency relationship with Hediger, essential to establishing apparent agency. *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003); *Spence, Payne, Masington & Grossman v. Gerson,* 483 So. 2d 775, 777 (Fla. 3d DCA 1986).

("DOAH").[19]  Township correctly responds that Plaintiff's proffer fails to demonstrate the required elements of *res judicata* and that in any event, there was never a final hearing in the administrative case.

Collateral estoppel prevents the same parties from relitigating issues that have previously been litigated and determined.  *Carlisle v. Phenix City Bd. of Educ.,* 849 F.2d 1376, 1379 (11th Cir. 1988).  To invoke collateral estoppel, four elements must be present: "(1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998).  The party attempting to invoke collateral estoppel bears the burden of proving that these elements have been satisfied. *Matter of McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989).

*Res judicata* prevents the relitigation of claims that have already been fully litigated and decided.  *Pleming*, 142 F.3d at 1356.  *Res judicata,* or claim preclusion, bars a subsequent claim when a court of competent jurisdiction entered a final judgment on the merits of the same cause of action in a prior lawsuit between the same parties.  *Id.*  "*Res judicata* acts as a bar 'not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact.'"  *Id.*  While *res judicata* requires a final judgment, the

---

[19] Plaintiff asserts that Township admitted before the DOAH to "refusing to sale, denying the property was available, setting different terms and conditions in the sale, and refusing to negotiate." (See Dkt. 200 at p.4).  According to Plaintiff: "Township not objecting to the allegations in the Petition for Relief and the Court accepting their refusal to object to the allegations means that the allegations in the Petition are now proof against them." (Id. at p. 5).

finality requirement for collateral estoppel is "less stringent." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1253 (11th Cir. 2006).

With respect to administrative agency decisions, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422 (1966)). Whereas preclusive effect would not apply to claims brought pursuant to Title VII, preclusive effect would apply to claims brought under one of the Reconstruction civil rights statutes. *See id.* at 796-99.

Here, the evidence presented by Plaintiff does not establish that Plaintiff is entitled to summary judgment on the basis of *res judicata* or collateral estoppel. The DOAH never conducted a final hearing on the merits because Plaintiff dismissed his petition. The DOAH accordingly never resolved any disputed issues of fact. Neither *res judicata* nor collateral estoppel therefore apply. *See Barry Cook Ford, Inc. v. Ford Motor Co.,* 616 So. 2d 512, 517 (Fla. 1st DCA 1993); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 9 (5th Cir. 1974).

In support of Plaintiff's collateral estoppel argument, Plaintiff provides only a "Notice of Understanding and Agreement" dated November 12, 2004 from the DOAH administrative action. That Notice provides that the "issue to be presented for resolution by Petitioner's claim for relief at the Chapter 120, Florida Statutes (2004), final hearing . . . is whether at all times material Petitioner can establish his 'intent to occupy' the structure of which Respondents have an interest." (Dkt. 200, Ex. F). The parties were to file memoranda of law attaching specific case law on which they rely regarding the "intent to occupy" issue ten days prior to the final hearing. (Id.). None of that

20

happened, as the action was dismissed because Plaintiff voluntarily declined to pursue his claim of housing discrimination before the DOAH on February 22, 2005. (Dkt. 299-2, 3).  Accordingly, Plaintiff's Motion with respect to collateral estoppel and/or *res judicata* is DENIED.

### Conclusion

This case has consumed an inordinate amount of judicial time and labor, due in no small part to Plaintiff's litigation tactics and obstructive conduct.[20]  Ultimately, as discussed, Plaintiff's theory of race discrimination has been shown to be baseless.  The principals of Township had no reason to know, much less consider, Plaintiff's race when they decided to accept Allied's $8 million offer over the other three $8 million offers, as well as Plaintiff's $7.3 million offer.  The purchase of the thirteen apartment complexes was a sophisticated transaction.  Plaintiff's offer was unquestionably inferior to Allied's and did not meet the requirements of the seller.  Simply put, by accepting Allied's offer, Township did not discriminate against Plaintiff because of his race.

After learning that his effort to purchase the properties was unsuccessful, Plaintiff has engaged in what can only be characterized as a pattern of obstructive and retaliatory conduct which has burdened these Defendants with costly litigation expense.  Plaintiff filed complaints against these Defendants in multiple administrative and judicial forums.[21]  When all is said and done, Plaintiff has accomplished nothing other than to prolong the inevitable and impose costly litigation expenses on

---

[20] Plaintiff has filed not less than one hundred fifteen (115) non-substantive motions and notices and has filed at least nine (9) unauthorized replies, in violation of the Local Rules.  Most of these motions were filed without any supporting factual or legal basis and have been, for the most part, summarily denied.

[21] For example, Plaintiff has filed no less than four federal lawsuits in this division against these same defendants or a combination of these defendants, premised on the same underlying facts.  *See Case Nos:* 04-CV-1502, 06-CV-657, 06-CV-1556, and 06-CV-1940.

the Defendants.[22]

Plaintiff's litigation tactics have unnecessarily burdened the court.  Plaintiff has repeatedly attempted to delay this case by seeking continuances and stays and filing numerous motions for reconsideration. (*See eg.* Dkts. 235, 244, 255, 277, 298).  Defendants have been required to resort to the Court to compel Plaintiff to participate in discovery. (Dkts. 243, 298).  He has filed numerous frivolous motions, notices and motions for sanctions or to hold parties in contempt. (Dkts. 150, 163, 164, 170, 187, 189, 289).  He has insisted on pursuing a specific performance claim which  was dismissed with prejudice, requiring unwarranted judicial attention. (Dkts. 213, 218, 226, 244).[23]

Undeterred by the many adverse rulings, even with respect to non-substantive issues, Plaintiff repeatedly attempted to have previously rejected arguments reconsidered, necessitating an order prohibiting him from seeking reconsideration without leave of court. (Dkt. 127).  Notwithstanding the stated necessity in that order to protect the Court's docket from such abusive litigation tactics, Plaintiff sought leave to "freely file" reconsideration motions. (Dkts. 269, 277).  Plaintiff has filed

---

[22]  For example, this record reflects that Plaintiff, without any statutory or contractual authority, recorded lis pendens in the public records, thereby encumbering Township's properties, obviously in an attempt to derail Allied's purchase.  He filed a complaint with the Florida Commission on Human Relations, alleging discrimination against these Defendants for "refusal to sell and false denial or representation of availability." (Dkt. 299).  That action was dismissed. Plaintiff amended his complaint, alleging violations of the Fair Housing Act, alleging "refusal to sell, denial of a property's availability, setting different terms and conditions in a contract, and refusing to negotiate." *Id*. After the matter was referred to the Division of Administrative Hearings, Plaintiff engaged in the same obstructive tactics seen in this action, seeking rulings on frivolous motions, seeking a stay, and seeking clarification and reconsideration of adverse rulings. Ultimately, rather than have his day in court, Plaintiff dismissed that action and resorted to the courts. *Id*.

Plaintiff's propensity to initiate multiple legal proceedings against these Defendants is a matter of record. (Dkts. 4, 14, 16).  As noted, he initiated four suits in federal court.  He filed at least three suits in state court against one or more of these Defendants and against attorneys who have been involved in some capacity with Plaintiff.  He initiated at least six administrative actions with the Florida Commission on Human Rights against one or more of these Defendants.  He has filed numerous unsuccessful appeals in the state and federal courts. *Id*.

[23]  *See* Dkts. 226, 244. Indeed, in Part II of his Motion for Summary Judgment, Plaintiff continues to maintain entitlement to specific performance, notwithstanding that his specific performance claim was dismissed long ago with prejudice. (Dkt. 107).

numerous interlocutory appeals with the Eleventh Circuit.  Those have been uniformly dismissed for lack of jurisdiction or failure on the part of Plaintiff to file briefs or pay filing fees.  In one instance, Plaintiff's appeal was dismissed because the Circuit Court determined that Plaintiff's allegation of poverty in his motion to proceed in *forma pauperis* on appeal was "untrue." (Dkt. 185).

Finally, Plaintiff insists that he has been mistreated during these proceedings and treated unfairly due to his *pro se* status.  (*See* Dkt. 247 at Ex. "E" p. 28-29).  To the contrary, counsel representing these Defendants have treated Plaintiff with respect and civility, notwithstanding the many accusations and baseless allegations Plaintiff brought against them, witnesses and the parties.[24] This Court has patiently indulged Plaintiff as a *pro se* litigant.  After more than a year and a half of litigation and in excess of 337 docket entries, Plaintiff's pursuit of his unfounded claims against these defendants must end.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.      Township Apartments Associates, Ltd.'s Motion for Summary Judgment (Dkt. 246) is **GRANTED.**

2.      Plaintiff's Amended Motion for Final Summary Judgment (Dkt. 200), is **DENIED.**

3.      Plaintiff shall take nothing by this action and Defendant may go hence without day.

4.      The Clerk is directed to enter judgment in favor of Township Apartments Associates,

---

[24] For example, Plaintiff filed an "Emergency Motion to Stay for Great Emotional Distress," in which he made accusations that counsel, a court reporter and a corporate representative made racially insensitive remarks during a deposition break (Dkt. 219), all of which was vehemently denied. (Dkt. 234).  This necessitated hearings and judicial intervention. (Dkts. 221, 223, 227, 228).  Given the nature of the allegations, and Plaintiff's insistence that he had a recording of the alleged comments, Plaintiff was directed to produce the recording in open court.  Ultimately, after listening to the recording, this Court found that the statements on the recording "were substantially different" than what Plaintiff had represented them to be and denied Plaintiff's motion. (Dkt. 244).

Ltd. and against Frank M. Bafford, close this case, and deny any pending motions as moot.

     5.      The Court reserves jurisdiction to tax costs and fees, if appropriate.

     **DONE AND ORDERED** in chambers this 30th day of November, 2007.


                    /s/James D. Whittemore
                    **JAMES D. WHITTEMORE**
                    **United States District Judge**


Copies to:
Counsel of Record
Plaintiff, *pro se*

24